IN THE MATTER OF PROBERT

Docket No. 61331. Argued October 2, 1979 (Calendar No. 1).—Decided June 19, 1981.

The Judicial Tenure Commission found Charles V. Probert, who had been a judge in the Wyoming Municipal Court until his term of office ended on December 31, 1978, guilty of judicial misconduct and recommended that he be permanently enjoined from holding judicial office. The proceedings were begun while Probert was a judge, but were completed after his term expired. He has held no judicial office since then. He argues that the Judicial Tenure Commission lacked jurisdiction in the matter and that the issue is moot because he no longer holds judicial office.

In an opinion by Justice Ryan, joined by Chief Justice Coleman and Justices Williams, Fitzgerald, and Moody, the Supreme Court *held:*

The specific recommendations of the Judicial Tenure Commission cannot be implemented in this case because Probert is presently not a judge and because the Court is not expressly empowered to enter a permanent injunction. However, he is not beyond the disciplinary reach of the Court, and he is publicly censured and conditionally suspended for five years; should he regain judicial office during that time, he will nevertheless be debarred from exercising that office.

1. Probert argues that once a judge leaves office the question of judicial discipline is rendered moot and the jurisdiction of the Judicial Tenure Commission over him is lost. Implicit in the argument is the view that the constitution authorizes the recommendation and imposition of discipline for incumbent judges only. Indeed, it is difficult to conceive how one who does not hold judicial office could be suspended, retired, or removed from office. Nevertheless, the Court has on at least three occasions issued conditional suspensions that would have fore-

REFERENCES FOR POINTS IN HEADNOTES
[1-27] 46 Am Jur 2d, Judges §§ 18-20, 50, 79.
   63 Am Jur 2d, Public Officers and Employees §§ 177 *et seq.,* 222 *et seq.*
Power of court to remove or suspend judge. 53 ALR3d 882.

closed the exercise of any judicial office to which the disciplined person might have been elected or appointed in the future. Such a conditional suspension, therefore, is not appropriately taken against incumbent judges only. Further, one who does not hold judicial office could be censured. In light of the purposes of judicial discipline, the censure of a former judge may be entirely expedient.

2. When a case of misconduct in office arises, the Court is obliged to make a judgment concerning the respondent's fitness to be a judge in the light of his misconduct, and must thus respond to individual considerations. But the decision must also be responsive to a significant institutional consideration, the preservation of the integrity of the judicial system. When a judge charged with misconduct removes himself from judicial office to avoid the notoriety and ignominy of disciplinary proceedings and the possibility of sanctions, censure, if deserved, may be essential to the preservation of the integrity of the judicial system because the alternative, silence, may be construed by the public as an act of condonation.

3. Because the possibilities of censure and conditional suspension remain, a discipline case does not become moot the instant the judge leaves office. Effective relief can still be granted; a controversy still exists. Establishment of a rule, therefore, of immediate termination of proceedings of the Judicial Tenure Commission when a judge leaves office is both unwarranted and unwise. There is good reason for proceedings to continue until completed, notwithstanding the judge's resignation or failure to be re-elected after the filing of a complaint.

4. The Judicial Tenure Commission's policy of declining to act further after the termination of a respondent's judicial office developed, no doubt, from its estimation of the most effective allocation of its resources. Once an unfit or incompetent judge is separated from judicial power, the greatest danger has passed, but the Court should not and will not transform the policy into a fast, inflexible rule of law that would preclude contrary action when the commission, in its considered judgment and discretion, deems it appropriate. Furthermore, to hold that the Court has no power to discipline a former judge would mean that the Court's power to vindicate the integrity of the judiciary could be negated by wholly irrelevant occurrences while a case is pending, such as the expiration of the judge's term of office, his resignation, or the length of time the Court takes to decide the case.

5. The four types of discipline that the constitution expressly empowers the Court to impose do not appear to comprehend a

permanent injunction. However, the Court also has a separate constitutional power of superintending control. It is an extraordinary power which is hampered by no specific rules or means for its exercise, and it invests the Court with the power to determine that a person is unfit for judicial office and to prevent him from exercising judicial power in this state for as long as he is, in the judgment of the Court, judicially unfit. The constitution, in granting the power of superintending control, explicitly prohibits the use of that power to remove a judge. But that specific prohibition does not have a cognate prohibition against the permanent injunction recommended in this case. If a permanent injunction is truly a form of "permanent prospective removal", then consistency would require that the provision which authorizes the Court to "remove" a judge upon the recommendation of the Judicial Tenure Commission also permits the Court to enter a permanent injunction; but that is clearly not the case.

6. The lack of superintending power to remove does not unavoidably entail a similar lack of superintending power to enjoin permanently. Removal deprives the judge of a more significant and tangible interest, the existing judgeship, than the interest impinged upon by a permanent injunction, the potentiality of attaining a judgeship, which is more problematic and uncertain. However, a permanent injunction might implicate the right of the voters to choose those who would hold judicial office. That suffrage is bestowed by the constitution. The Court's power of superintending control should be construed, if possible, to harmonize with other constitutional provisions. Therefore, it does not comprehend the power to enjoin a person permanently from holding judicial office. Probert no longer holds judicial office. The recommendation of the Judicial Tenure Commission that he be removed from office is moot, and the recommendation that he be permanently enjoined from holding judicial office cannot be carried out. Nevertheless, the possibilities of censure and conditional suspension remain.

7. The Judicial Tenure Commission found that Probert habitually and willfully disregarded statutes, court rules, canons, and other ethical responsibilities in the administration of justice; improperly used his judicial office to benefit his friends and court employees; engaged in conduct giving rise to impropriety and the appearance of impropriety; and exhibited a gross lack of judicial temperament and impartiality. A review of the record shows that the findings of the commission are amply supported, and Probert has filed no objection to the master's report upon which they are based. Probert's actions, taken as a

whole, constitute conduct clearly prejudicial to the administration of justice, misconduct in office, and persistent failure to perform judicial duties, all proscribed by the constitution and the General Court Rules of 1963. Certainly such egregious misconduct and judicial perfidy warrant the imposition of disciplinary measures. The Court cannot ignore Probert's acts, because it is important not only that the integrity of the judiciary be preserved but that the appearance of that integrity be maintained. Probert is publicly censured and a five-year conditional suspension without pay imposed. Should he regain judicial office during that time, Probert will be barred from exercising the power and prerogatives of the office at least until the expiration of the suspension.

Justice Levin, joined by Justice Kavanagh, dissenting, would hold that the Judicial Tenure Commission is not empowered to recommend discipline of, nor may the Supreme Court on the commission's recommendation impose discipline on, a person who no longer holds judicial office.

1. The Constitution of 1963 carried forward the provisions of earlier constitutions granting the Supreme Court broad powers of superintending control, but expressly denied the Court the power to remove judges. An amendment to the judicial article adopted in 1968 established the Judicial Tenure Commission and gave the Court the power to discipline judges on the recommendation of the commission. The function of the commission is to monitor the conduct of persons charged with the administration of justice and to recommend disciplinary action to the Supreme Court. The focus of the constitutional provision establishing the commission is the discipline of persons with judicial tenure; the disciplinary actions which the commission may recommend—censure, suspension, retirement, or removal —are stated to be actions in discipline of "a judge". Accordingly, disciplinary action cannot be exerted against a person who has left judicial office.

2. Suspension, retirement and removal all involve the separation of a person from whatever judicial authority or office he has. The conditional suspension imposed by the Court would become effective only if Probert again attains judicial office during the period of conditional suspension; it has no present effect. Censure was intended to be the least severe form of discipline, reserved for situations where, while some disciplinary action is indicated, the judge is expected to correct his conduct with a minimum of reprobation. It skews the constitutionally prescribed scheme of discipline to construe censure as a discipline which may be imposed on a person determined to

be unfit to continue serving as a judge. Nor can a person who no longer holds judicial office be expected to correct his conduct. Further, the disciplines are listed in the alternative and their gradation in severity indicates that it was contemplated that a choice of discipline would be made according to the severity of the misconduct. The decision to impose both censure and conditional suspension for the same misconduct is thus at odds with the apparent intent of the constitution.

3. The general rule is that once jurisdiction is obtained over the parties it will not be defeated by a change of a party's status, such as residence, but that rule does not govern here. The power to act is defeated because the constitution authorizes the recommendation and imposition of discipline for incumbent judges only. It is that lack of power which defeats jurisdiction.

4. Continuing proceedings against Probert would serve no purpose other than to punish or make an example of him, or inform the public of his misdeeds. These are not functions of Judicial Tenure Commission proceedings, but merely consequences of the disciplinary function. Proceedings which should otherwise terminate should not be continued simply to effect those ends. If Probert is to be found guilty of conduct prejudicial to the administration of justice and that finding is to be the basis of disciplinary action by the Attorney Grievance Commission, the finding should be made in the context of attorney disciplinary proceedings so that the focus can be his conduct as a member of the bar and not his fitness for judicial office. A judge is subject to discipline for conduct prior to his taking office or during a previous tenure. Were Probert to regain judicial office, he would again be subject to proceedings before the Judicial Tenure Commission and, if appropriate, discipline might be recommended based on the record made in these proceedings.

5. There remains the possibility that a resigned or defeated judge will be assigned judicial duties by the Supreme Court pursuant to its powers under the constitution. Judges are assigned in the exercise of the Court's discretion; they have no tenure and no right to discharge judicial functions except as authorized by the Court. Communication with the Judicial Tenure Commission should be but one step in making an assignment. The court rule which provides for confidentiality of commission records before a complaint is filed also provides that the commission may release information about assigned judges to the State Court Administrator.

6. Education of the public, like education of other judges, is

merely a consequence of the disciplinary function, not an end in itself, to be pursued after the disciplinary function has ceased. If the Judicial Tenure Commission has the power to continue proceedings against a person who is no longer a judge, it might initiate proceedings for misconduct which has only come to light since the judge has left office, or it might feel obliged to employ the power not to protect the public but to appease the public clamor caused by the unearthing of misconduct. The resources of the commission should be dedicated to the essential constitutional purpose of preventing the abuse of judicial power by those who exercise it.

7. The power of superintending control is separate and distinct from the disciplinary power set forth in the constitution. The Court has no authority under its power of superintending control to permanently enjoin a person from holding judicial office. To construe the power to temporarily suspend a judge from the exercise of judicial office in the exercise of the power of superintending control as the equivalent of what was expressly withheld by the constitution, the power to remove from the office itself, would be to betray the trust placed in the Court's restraint by the constitutional convention, and would violate the understanding on which it was granted. The power to forbid the electorate from ever again exercising the franchise in favor of a particular person, a much greater power than the granted power to remove or suspend a judge, has not been expressly granted in this state as it has been in some others, and should not be inferred. The distinction between the power of superintending control and the authority to discipline a judge should not be blurred by using the Judicial Tenure Commission to fulfill the Court's duties of superintending control or by empowering the commission to investigate and recommend how the Court should exercise the discretion entrusted to it.

8. In some cases, the Court has suspended incumbent judges for periods longer than their terms of office. However, there is no indication that those cases considered whether the constitution authorizes imposition of a suspension which has no immediate effect. The question in this case is not how much is appropriate but whether there is power to discipline at all.

9. The opinion of the Court asserts that to end proceedings when a judge leaves office would be unwise. Such policy arguments cannot properly be the sole basis for a construction of the constitution unless the Court can say without a doubt that the normal meaning of the language is so absurd or unreasonable as to preclude its having been intended. It is not absurd,

unreasonable or even unwise to terminate disciplinary proceedings where the essential purpose of the Judicial Tenure Commission, keeping unfit judges off the bench, has been achieved by the judge simply leaving office.

10. Action against a person who has no judicial power to abuse does not promote the public's confidence that those who do have judicial power will not abuse it. The discipline ordered by the Court is punishment; its primary purpose is not to prevent the abuse of judicial authority but to react to abuse that has occurred. The constitutional procedures for the discipline of judges should not be employed to proclaim displeasure, however justified, with judicial misconduct. The public interest in the administration of justice and the interest in maintaining the good name of the judiciary are not served by further public airings of allegations and proofs of judicial misconduct. Clearly, once the judgeship is terminated the fundamental jurisdictional element ceases to exist.

The complaint should be dismissed without prejudice to the ability of the Judicial Tenure Commission to recommend discipline based on the record should Probert ever regain judicial office.

OPINION OF THE COURT

1. JUDGES — DISCIPLINE — MISCONDUCT.

The Supreme Court is obliged in a judicial discipline case to respond to individual considerations and also an institutional consideration, the preservation of the integrity of the judicial system (Const 1963, art 6, § 30; GCR 1963, 932).

2. JUDGES — DISCIPLINE — FORMER JUDGES — MISCONDUCT.

The censure of a former judge, if deserved, may be entirely expedient and essential to the preservation of the integrity of the judicial system because the alternative, silence, may be construed by the public as an act of condonation (Const 1963, art 6, § 30; GCR 1963, 932).

3. JUDGES — DISCIPLINE — FORMER JUDGES — MOOTNESS.

A judicial discipline case does not become moot the instant the judge leaves office, because the possibilities of censure and conditional suspension remain after a judge charged with misconduct steps down or fails to be re-elected (Const 1963, § 30; GCR 1963, 932).

4. JUDGES — DISCIPLINE — FORMER JUDGES — JUDICIAL TENURE COMMISSION.

A judge charged with misconduct should not have the power

simply by leaving office to short-circuit investigation by the Judicial Tenure Commission against him, leaving the proceedings incomplete and subject to the abrasion of time (Const 1963, art 6, § 30; GCR 1963, 932).

5. JUDGES — DISCIPLINE — FORMER JUDGES — JUDICIAL TENURE COMMISSION.

There is good reason for proceedings of the Judicial Tenure Commission to continue until completed, notwithstanding the judge's resignation or failure to be re-elected after the filing of a complaint of judicial misconduct (Const 1963, art 6, § 30; GCR 1963, 932).

6. JUDGES — DISCIPLINE — FORMER JUDGES — JUDICIAL TENURE COMMISSION.

A policy of the Judicial Tenure Commission that it declines to act further after the termination of a respondent's judicial office by resignation, failure to be re-elected, or death should not be transformed into a fast, inflexible rule of law that would preclude contrary action when the commission deems it appropriate (Const 1963, art 6, § 30; GCR 1963, 932).

7. JUDGES — DISCIPLINE — FORMER JUDGES — MISCONDUCT.

To hold that the Supreme Court has no power to discipline a former judge after he has left office would mean that the Court's power to vindicate the integrity of the judiciary could be negated by wholly irrelevant occurrences, such as the expiration of the judge's term of office, his resignation, or the length of time the Court takes to decide the case (Const 1963, art 6, § 30; GCR 1963, 932).

8. SUPERINTENDING CONTROL — CONSTITUTIONAL LAW — COURTS.

The power of superintending control conferred by the constitution on the Supreme Court is a power separate from its other powers of original jurisdiction and appeal, its purpose being to keep the courts themselves within bounds and to ensure the harmonious working of the judicial system (Const 1963, art 6, § 4).

9. JUDGES — SUPERINTENDING CONTROL — DISCIPLINE — CONSTITUTIONAL LAW — COURTS.

The constitutional power of superintending control invests the Supreme Court with the power to determine that a person is unfit for judicial office and to prevent him from exercising judicial power in this state for as long as he is, in the judgment of the Court, judicially unfit, even though the constitution, in

granting the power of superintending control, explicitly prohibits its use to remove a judge from office (Const 1963, art 6, § 4).

10. JUDGES — SUPERINTENDING CONTROL — DISCIPLINE — PERMANENT REMOVAL — ELECTIVE OFFICE.

The constitutional power of superintending control does not give the Supreme Court the power to enjoin a person permanently from holding judicial office because a permanent injunction might implicate the right of the voters to choose those who would hold judicial office and prevent the electorate from ever again exercising its constitutional suffrage in favor of a particular person (Const 1963, art 2, § 1; art 6, §§ 2, 4, 8, 12, 16).

11. JUDGES — DISCIPLINE — MISCONDUCT.

Actions by a judge which, taken as a whole, constitute conduct clearly prejudicial to the administration of justice, misconduct in office, and persistent failure to perform judicial duties, all proscribed by the constitution and the General Court Rules of 1963, certainly warrant the imposition of disciplinary measures (Const 1963, art 6, § 30; GCR 1963, 932.4).

12. JUDGES — DISCIPLINE.

It is important not only that the integrity of the judiciary be preserved but that the appearance of that integrity be maintained, and consequently the Supreme Court cannot ignore judicial misconduct, even though the judge has left office since.

DISSENTING OPINION BY LEVIN, J.

See headnote 10.

13. JUDGES — DISCIPLINE — CONSTITUTIONAL LAW.

*The Judicial Tenure Commission is not empowered to recommend discipline of, nor may the Supreme Court, on the commission's recommendation, impose discipline on, a person who no longer holds judicial office (Const 1963, art 6, § 30; GCR 1963, 932).*

14. JUDGES — DISCIPLINE — CENSURE.

*Censure was intended to be the least severe form of discipline of a judge, reserved for situations where, while some disciplinary action is indicated, the judge is expected to correct his conduct with a minimum of reprobation (Const 1963, art 6, § 30; GCR 1963, 932).*

15. JUDGES — DISCIPLINE — CENSURE.

*It skews the constitutionally prescribed scheme of discipline of judges to construe censure as a discipline which may be im-*

*posed on a person determined to be unfit to continue serving as a judge (Const 1963, art 6, § 30; GCR 1963, 932).*

16. JUDGES — DISCIPLINE — CENSURE.
*The disciplines which the Supreme Court may impose on judges who are guilty of misconduct are listed by the constitution in the alternative, and their gradation in severity indicates that it was contemplated that a choice of discipline would be made according to the severity of the misconduct; a decision by the Court to impose both censure and conditional suspension for the same misconduct is at odds with the apparent intent of the constitution (Const 1963, art 6, § 30; GCR 1963, 932).*

17. JUDGES — DISCIPLINE — FORMER JUDGES.
*The interests in punishing a former judge, making an example of him, or informing the public of his misdeeds are not functions of the Judicial Tenure Commission and do not warrant continuation of the proceedings against a person who no longer holds judicial office (Const 1963, art 6, § 30; GCR 1963, 932).*

18. JUDGES — DISCIPLINE — ATTORNEY GRIEVANCE COMMISSION — JUDICIAL TENURE COMMISSION.
*The Attorney Grievance Commission has power to investigate and recommend discipline for conduct by a lawyer which has been the subject of proceedings in the Judicial Tenure Commission, and the record of the tenure commission proceedings is admissible into evidence at the hearing of the Attorney Grievance Commission; however, the Attorney Grievance Commission must find the facts itself and recommend the discipline it thinks appropriate even where conduct which is the basis of the discipline is the same (GCR 1963, 965).*

19. JUDGES — DISCIPLINE — ATTORNEY GRIEVANCE COMMISSION — JUDICIAL TENURE COMMISSION.
*The Attorney Grievance Commission and the Judicial Tenure Commission operate independently to protect distinct interests and maintain distinct professional standards; a judge's conduct might be prejudicial to the administration of justice while identical conduct by a lawyer might not be, and a person's conduct or temperament might render him unfit to hold judicial office while not substantially affecting his fitness to be a member of the State Bar (GCR 1963, 932, 950 et seq.).*

20. JUDGES — DISCIPLINE — TIME OF MISCONDUCT.
*A judge is subject to discipline for conduct prior to his taking office or during a previous tenure; if a judge who is accused of judicial misconduct ceases to hold office before disciplinary*

proceedings run their course and then regains judicial office, the Judicial Tenure Commission may reactivate the inquiry into the judge's conduct and may recommend that the Supreme Court impose discipline for that conduct (GCR 1963, 932).

21. JUDGES — ASSIGNMENT — FORMER JUDGES.

Former judges who are assigned judicial duties pursuant to the constitutional power of the Supreme Court are assigned in the exercise of the Court's discretion, and have no tenure and no right to discharge judicial functions except as authorized by the Court; assignments in the exercise of constitutional power should be made after individual review, and only those ex-judges who have enhanced the judiciary in the past and who can be expected to do so in the future should be recalled to the bench (Const 1963, art 6, § 23).

22. JUDGES — DISCIPLINE — JUDICIAL TENURE COMMISSION.

Discipline of a judge which is not intended to rehabilitate the judge or protect the judicial office is mere punishment and not within the disciplinary power of the Judicial Tenure Commission (Const 1963, art 6, § 30; GCR 1963, 932).

23. JUDGES — DISCIPLINE — PUBLIC INTEREST.

The public's interest in judicial discipline is in assuring that justice is administered properly, in preserving the integrity of the courts and the judicial process, and in maintaining public confidence in the judiciary by assuring that judges conduct themselves in a manner befitting the judicial office (Const 1963, art 6, § 30; GCR 1963, 932).

24. JUDGES — DISCIPLINE — FORMER JUDGES — ATTORNEY GRIEVANCE COMMISSION.

The termination of proceedings of the Judicial Tenure Commission against a judge because he no longer holds judicial office does not preclude the operation of attorney disciplinary proceedings against the judge; if his misdeeds as a judge were such as to render him unfit to be a member of the State Bar, the Attorney Grievance Commission may recommend discipline (Const 1963, art 6, § 30; GCR 1963, 932, 950 et seq.).

25. SUPERINTENDING CONTROL — CONSTITUTIONAL LAW — DISCIPLINE — JUDICIAL TENURE COMMISSION.

The Supreme Court's power of superintending control is separate and distinct from the disciplinary powers the Court exercises on recommendation of the Judicial Tenure Commission; the constitutional convention, as a compromise, in effect granted the Court the power of temporary suspension of judges as being

*essential to the proper superintending of the courts, but expressly withheld from the supervisory power the power to remove judges from office (Const 1963, art 6, §§ 4, 30).*

26. JUDGES — CONSTITUTIONAL LAW — PERMANENT REMOVAL — ELECTIVE OFFICE.

*The power to forbid the electorate from ever again exercising the franchise in favor of a particular person by permanently enjoining the person from holding judicial office has not been expressly granted to the Supreme Court, and should not be inferred (Const 1963, art 6, § 30; GCR 1963, 932).*

27. JUDGES — DISCIPLINE — FORMER JUDGES.

*The suspension from judicial office of a person who is not a judge and censure which cannot correct judicial conduct is not, in any proper sense, judicial discipline; the procedures provided by the constitution for the discipline of judges should not be employed to proclaim displeasure, however justified, with judicial misconduct because the primary purpose should be the protection of the public and the integrity of the judicial process by preventing the abuse of judicial authority by persons who are in a position to abuse it (Const 1963, art 6, § 30; GCR 1963, 932).*

*Joseph F. Regnier,* Executive Director and General Counsel, *Stanley T. Dobry,* Co-Examiner, and *Thomas L. Prowse* and *Christopher S. Boyd,* Staff Attorneys, for the Judicial Tenure Commission.

*Cholette, Perkins & Buchanan* (by *Richard D. Ward* and *Robert A. Benson)* for respondent.

RYAN, J. We are presented in this case with questions pertaining to findings and recommendations of the Judicial Tenure Commission and the power of this Court as it relates to the discipline of members of the state judiciary. The questions are of first impression and arise because respondent Charles V. Probert, the subject of the proceedings before us, is no longer a judge.

Respondent maintains that his departure from judicial office since the institution of formal disci-

plinary proceedings divested the commission of jurisdiction over him and precludes this Court from imposing effective discipline. It follows, he contends, that we should reject the commission's recommendation of discipline. We find this argument unpersuasive.

In response to the conduct detailed in Part III of this opinion, the commission has recommended that respondent "be removed from judicial office and permanently enjoined from holding such office in the future". We conclude that because respondent is presently not a judge and because we are not expressly empowered to enter an injunction of the nature sought here, we cannot implement the specific recommendations of the commission.

We hold further, however, that respondent is not beyond our disciplinary reach and conclude that he should be censured and conditionally suspended for five years, regardless of any possible intervening election or appointment to judicial office.

The facts and procedural history of the case are fully delineated in Part I of Justice LEVIN's opinion.

I

In 1968, the people of Michigan amended the state constitution and established the commission.

"(1) A judicial tenure commission is established consisting of nine persons selected for three-year terms as follows: Four members shall be judges elected by the judges of the courts in which they serve; one shall be a court of appeals judge, one a circuit judge, one a probate judge and one a judge of a court of limited jurisdiction. Three shall be members of the state bar who shall be elected by the members of the state bar of whom one

shall be a judge and two shall not be judges. Two shall be appointed by the governor; the members appointed by the governor shall not be judges, retired judges or members of the state bar. Terms shall be staggered as provided by rule of the supreme court. Vacancies shall be filled by the appointing power.

"(2) On recommendation of the judicial tenure commission, the supreme court may censure, suspend with or without salary, retire or remove a judge for conviction of a felony, physical or mental disability which prevents the performance of judicial duties, misconduct in office, persistent failure to perform his duties, habitual intemperance or conduct that is clearly prejudicial to the administration of justice. The supreme court shall make rules implementing this section and providing for confidentiality and privilege of proceedings." Const 1963, art 6, § 30 (hereinafter § 30).

Section 30(2) prescribes four kinds of discipline: censure, suspension (with or without salary), retirement, and removal. Respondent avers that once a judge leaves office the question of judicial discipline is rendered moot and the commission's jurisdiction over him is lost. Implicit in the argument is the view that § 30(2) discipline befits incumbent judges only. This is the position espoused by Justice LEVIN, who concludes that "§ 30 authorizes the recommendation and imposition of discipline for *incumbent judges only*".[1] Thus, upon a judge's resignation or the expiration of his term, our colleague holds, commission proceedings must cease and this Court's power to discipline that person under § 30(2) evaporates. We do not read that provision so narrowly.

Indeed, it is difficult to conceptualize how one who does not hold judicial office could be suspended, retired, or removed from office. Nevertheless, we have on at least three occasions issued

---

[1] Justice LEVIN's opinion, p 245 (emphasis added).

conditional suspensions that would have foreclosed the exercise of the prerogatives inhering in any judicial office to which the disciplined party might have been elected or appointed in the future, the condition being, of course, re-election or appointment to judicial office. *In the Matter of Mikesell,* 396 Mich 517, 549; 243 NW2d 86 (1976); *In the Matter of Del Rio,* 400 Mich 665, 672, fns 3-4; 256 NW2d 727 (1977); *In the Matter of Bennett,* 403 Mich 178, 200; 267 NW2d 914 (1978). The effect of those suspensions would have been to disengage the disciplined party from judicial power, but only had that person come to occupy judicial office again during the term of the suspension, and only to the extent that the terms of office and suspension coincided. Clearly, it is immaterial to a suspension of this nature whether or not the disciplined party holds judicial office when the suspension is imposed.[2] A conditional suspension, therefore, is not appropriately taken against incumbent judges only.[3]

Furthermore, it is not at all difficult to conceptualize how one who does not hold judicial office could be censured. Respondent himself concedes the possibility. In light of the purposes of judicial discipline,[4] the censure of a former judge may be entirely expedient.

---

[2] The fact that the respondents in *Mikesell, Del Rio,* and *Bennett* were sitting judges when we imposed discipline and respondent is not is a distinction without a difference insofar as this Court's power to impose the conditional suspensions is concerned. If we lacked the power to suspend those persons from judicial offices not then held, the suspensions in those cases exceeded our power. However, nobody has made that claim, then or now.

[3] In contending that the case is moot, respondent implies that it is impossible to suspend, retire or remove a person from a position he does not hold. We agree. This is entirely consistent with the issuance of a conditional suspension that will become operative, if ever, only in the future against a person who does not presently occupy judicial office.

[4] For a concise description of these purposes, see the statement of the American Bar Association quoted in fn 10, *infra.*

When we are confronted with a case of misconduct in office and the question of judicial discipline arises, we are obliged to make a judgment concerning the respondent's fitness to be a judge in light of his misconduct. Thus, a decision to enter an order of judicial discipline must be responsive to individual considerations. But our concern encompasses more: when one commits judicial misconduct he not only marks himself as a potential subject of judicial discipline, he denigrates an institution.[5] Accordingly, a decision on judicial discipline must also be responsive to a significant institutional consideration, "the preservation of the integrity of the judicial system".[6] Institutional integrity, after all, is at the core of institutional effectiveness.

When a judge charged with misconduct removes himself from judicial office to avoid the notoriety and ignominy incident to disciplinary proceedings and the possibility of sanctions, censure, if deserved, may be essential to "the preservation of the integrity of the judicial system", especially if that integrity has been critically undermined, because the alternative, silence, may be construed by the public as an act of condonation.[7]

As earlier stated, respondent asserts that because he is no longer a judge the case is moot.

[5] The relationship of a judge to the judiciary and the judiciary to the public are expressed in the words of Canon 1 of our Code of Judicial Conduct:

"A JUDGE SHOULD UPHOLD THE INTEGRITY AND INDEPENDENCE OF THE JUDICIARY

"An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. A judge should always be aware that the judicial system is for the benefit of the litigant and the public, not the judiciary. The provisions of this Code should be construed and applied to further those objectives."

[6] In the Matter of Del Rio, 400 Mich 665, 725; 256 NW2d 727 (1977).

[7] See In re Inquiry Relating to District Judge Harold L Hammond,

Because the possibilities of censure and conditional suspension remain after a judge charged with misconduct steps down or fails to be re-elected, a judicial discipline case does not become moot the instant the judge leaves office. Effective relief can still be granted; a controversy still exists. See generally *Del Rio, supra,* 685-686; *McCarthy v Wayne Circuit Judge,* 294 Mich 368, 373; 293 NW 683 (1940); *Detroit v Killingsworth,* 48 Mich App 181, 183; 210 NW2d 249 (1973). Establishment of a rule, therefore, calling for immediate termination of commission proceedings upon a judge's leaving office is unwarranted.

Such a rule would also be unwise. A judge charged with misconduct should not have the power, simply by leaving office, to short-circuit investigation of the allegations against him, leav-

---

224 Kan 745; 585 P2d 1066 (1978) (public censure of judge who had resigned due to physical disabilities).

Moreover, censure of a former judge would not preclude on double jeopardy grounds additional discipline, such as removal, based on the same misconduct were that person to regain judicial office in the future. As we noted in *In the Matter of Mikesell,* 396 Mich 517, 528; 243 NW2d 86 (1976), commission proceedings are *not* criminal in nature:

" 'The proceedings of the Judicial Board are investigatory and advisory and are not binding upon the Supreme Court. No determination of criminal guilt is made, but merely a determination of the Judicial Board's view of the conformity of the subject of investigation to the state constitutional standards for judicial office. *Similarly, the resulting Order of the Supreme Court does not operate as a sanction for criminal guilt but as a judgment on judicial fitness.* At most, the proceedings of the Judicial Board could be characterized as quasi-judicial administrative hearings, and the Order of the Supreme Court as a judicial disciplinary order.' " (Emphasis in original) (quoting *Keiser v Bell,* 332 F Supp 608, 616 [ED Pa, 1971]).

Thus, we held in *Ransford v Graham,* 374 Mich 104, 109; 131 NW2d 201 (1964), that the refusal of the Michigan House of Representatives to vote for the judge's removal did not preclude, on double jeopardy grounds, our subsequent suspension of him because "[n]either the proceedings in this Court nor those in the legislature were criminal". Accordingly, constitutional provisions, insofar as they are designed to afford rights to criminal defendants, are inapposite to commission proceedings. See generally 53 ALR3d 882, § 12[a], pp 912-914. Compare fn 13, *infra.*

ing the proceedings incomplete and subject to the abrasion of time.[8] Events pertaining to alleged judicial misconduct and the recommendation of the commission with respect to those events should be as close in time as possible. There is good reason, therefore, for commission proceedings to continue until completed, notwithstanding a judge's resignation or failure to be re-elected after the filing of a complaint.

We are advised that as a matter of *policy*, "the [c]ommission has declined to act further after termination of a respondent's judicial office by resignation, by failure to be re-elected, or by death".[9] This policy no doubt developed in light of the commission's estimation of the most effectual allocation of its resources. Once an unfit or incompetent judge is separated from judicial power, the greatest danger has passed. Be that as it may, this Court should not and will not transform that

---

[8] To the same effect is the following statement of the Supreme Court of North Carolina:

"[I]t would indeed be a travesty if a judge could avoid the full consequences of his misconduct by resigning from office after removal proceedings had been brought against him." *In re Inquiry Concerning a Judge No 53, Linwood T Peoples*, 296 NC 109, 150-151; 250 SE2d 890, 914 (1978).

Moreover, Justice LEVIN concedes as much:

"We recognize that the Judicial Tenure Commission's ability to recommend discipline based on prior misconduct in office might be embarrassed if judges were able to shield themselves from inquiry by resigning and could wait until evidence of misdeeds has faded with time, and then regain and hold judicial office with impunity." Justice LEVIN's opinion, fn 15.

This recognition leads my brother to qualify the ban against continuing proceedings after a judge leaves office:

"There might * * * be situations where it would be appropriate for this Court to direct the Judicial Tenure Commission to proceed against an ex-judge to the point of preserving testimony." *Id.*

We are not convinced that such a limitation on the commission's range of action is prudent.

[9] Brief in Support of Dissenting [Commission] Opinion and Minority Recommendation, p 2.

policy into a fast, inflexible rule of law that would preclude contrary action when the commission, in its considered judgment and discretion, deems it appropriate.[10]

Furthermore, to hold that this Court has no power to discipline a former judge would work undue mischief, which would be most apparent, for example, in a case in which a judge leaves office after his case is submitted to us and only the question of discipline remains. Such a holding would mean that at a time when the commission has completed its work and we have before us all the information and materials necessary to render judgment, our power to vindicate the integrity of the judiciary could nonetheless be negated by wholly irrelevant occurrences such as the expira-

---

[10] Considerations affecting the decision to continue proceedings against a judge after he has left office may include, but are not limited to, the likelihood of re-election to judicial office, the gravity of the misconduct, and the importance of official reprobation to public confidence and trust in the integrity of the Michigan judicial system. In this regard, those charged with the task of supervising the conduct of our judges must always bear in mind the functions of judicial discipline:

"[T]he *major purpose of judicial discipline is not to punish judges,* but to protect the public, preserve the integrity of the judicial process, maintain public confidence in the judiciary, and create a greater awareness of proper judicial behavior on the part of judges themselves." ABA Standards Relating to Judicial Discipline and Disability Retirement (Tentative Draft, 1977, approved by ABA House of Delegates, February, 1978), p 2 (emphasis added).

It might be argued that permitting proceedings to *continue* against a judge who leaves office during the pendency of proceedings would require us to permit the commission to *begin* proceedings against a judge after he leaves office. This reasoning, however, is not cogent. To forbid the filing of a complaint after a judge has left office is simply to give effect to considerations underlying our various statutes of limitations. It would also tend to ensure that the commission is not acting pursuant to motives unrelated to its proper mission. Finally, a distinction related to the purpose of commission proceedings can be drawn between filing a complaint against a sitting judge and a former judge: a well-founded complaint may encourage the sitting judge, who is guilty of misconduct, to resign or not run for re-election. These pressures, which are germane to the essential purpose of the commission—keeping unfit judges off the bench—have no relevance to a former judge.

tion of the judge's term of office, his resignation, or the length of time we take to decide the case.

## II

The question whether this Court is empowered to permanently enjoin respondent from holding judicial office in the future remains. Our authority to discipline members of the state judiciary flows from two sources, §§ 30 and 4 of article 6 of the Michigan Constitution.

The four types of discipline § 30 empowers this Court to impose—censure, suspension, removal, and retirement—do not appear to comprehend the permanent injunction sought here.[11]

Section 4 embodies a more general grant of power, the power of superintending control.

"The supreme court shall have general superintending control over all courts; power to issue, hear and determine prerogative and remedial writs; and appellate jurisdiction as provided by rules of the supreme court. The supreme court shall not have the power to remove a judge." Const 1963, art 6, § 4 (hereinafter § 4).

As explained in *In re Huff,* 352 Mich 402, 418; 91 NW2d 613 (1958):

"The superintending control conferred by Constitution on this Court is a power separate, independent and distinct from its other original jurisdiction and appellate powers, its purpose being 'to keep the courts themselves "within bounds" and to insure the harmonious

---

[11] "Suspension" is defined as "[a]n ad interim stoppage or arrest of official power and pay; —not synonymous with 'removal' which terminates wholly the incumbency of the office or employment". Black's Law Dictionary (4th rev ed), p 1616.

"Retirement" refers to divestiture of office for reasons pertaining to physical or mental infirmity, rather than misconduct, and is not in issue here. ABA Standards Relating to Judicial Discipline and Disability Retirement, *supra,* Commentary to Standard No. 6.7, pp 52-53; Standard Nos. 8.1-8.8, pp 60-63.

Neither "suspension" nor "removal" connotes a *permanent* disqualification from office.

working of our judicial system.' Such power having
been conferred by Constitution upon this Court, it also
received all the power necessary to make that control
and its implementing orders and writs effective." (Cita-
tions omitted.)

The *Huff* Court also outlined the great breadth of
the power:

" 'The power of superintending control is an extraor-
dinary power. It is hampered by no specific rules or
means for its exercise. It is so general and comprehen-
sive that its complete and full extent and use have
practically hitherto not been fully and completely
known and exemplified. It is unlimited, being bounded
only by the exigencies which call for its exercise. As
new instances of these occur, it will be found able to
cope with them. Moreover, if required, the tribunals
having authority to exercise it will, by virtue of it,
possess the power to invent, frame, and formulate new
and additional means, writs, and processes whereby it
may be exerted. This power is not limited by forms of
procedure or by the writ used for its exercise. Further-
more, it is directed primarily to inferior tribunals, and
its relation to litigants is only incidental.' " *Id.,* 417-418.

It is true that § 4 explicitly prohibits this Court
from utilizing its power of superintending control
to *remove* a judge.[12] Nevertheless, "for the purpose
of protecting the purity of judicial processes and
maintaining public confidence in the administra-
tion of justice", we indefinitely enjoined a judge
"from exercising the powers and duties of [his]
office" pursuant to our power of superintending
control. *Ransford v Graham,* 374 Mich 104, 108;

---

[12] In contrast, we may utilize the power conferred by § 30 to remove
a judge. Aside from § 30, the power to remove a judge resides in our
Governor and Legislature. Const 1963, art 6, § 25 (for "reasonable
cause" short of grounds for impeachment); art 11, § 7 (impeachment
of civil officers, including judges "for corrupt conduct in office or for
crimes or misdemeanors").

131 NW2d 201 (1964); *In re Graham,* 366 Mich
268, 280-281 fn of REPORTER; 114 NW2d 333 (1962)
(same case); accord, *In re Mussman,* 112 NH 99;
289 A2d 403 (1972); *In the Matter of DeSaulnier,*
360 Mass 787; 279 NE2d 296 (1972).

It is important to stress that our opinion today
does not signal a retreat from the sound principles
enunciated in *Huff, supra,* and *Graham, supra.* As
the head of the state judiciary, it is this Court's
duty " 'to keep the [Michigan] courts * * * "within
bounds" and to insure the harmonious working of
our judicial system' ". *Huff, supra,* 418. That sys-
tem is only as good as its constituent judges.
Accordingly, § 4 invests this Court with the power
to determine that a person is unfit for judicial
office and to prevent him from ever exercising
judicial power in this state for as long as he is, in
our judgment, judicially unfit.[13]

Section 4 does not explicitly bar us from perma-
nently enjoining one from holding judicial office.
The provision, however, does declare that we have
no power to *remove* a judge. We do not find in this

---

[13] This, of course, is not to say that we are empowered to act
arbitrarily or capriciously. A determination of judicial unfitness must
always be accompanied by the safeguards of procedural due process.
See, *e.g., In re Graham,* 366 Mich 268, 275; 114 NW2d 333 (1962); *In
re Heideman,* 387 Mich 630, 632; 198 NW2d 291 (1972); *In the Matter
of Del Rio,* 400 Mich 665, 682-689; 256 NW2d 727 (1977). See gener-
ally GCR 1963, 930, 932.

Most cases of judicial discipline are handled within the provisions
of § 30. The question of this Court's power under § 4 to discipline
judges, however, is independent of that fact.

In *In the Matter of Del Rio,* 400 Mich 665, 679; 256 NW2d 727
(1977), the commission recommended that Judge Del Rio "be enjoined
from *holding* judicial office in the future". In a separate concurring
opinion, I stated that I "would enjoin him from *serving* in any state
judicial office in the future". *Del Rio,* p 727 (emphasis added). As we
reaffirmed in that case, "the right of the people of a judicial circuit to
the *service* of a judge whom they have elected is subject to express
and distinct limitations and qualifications provided for by the Consti-
tution and statutes". 400 Mich 685, fn 6 (emphasis added) (construing
*In re Huff,* 352 Mich 402; 91 NW2d 613 [1958]).

specific prohibition a cognate prohibition against the permanent injunction recommended here. If a permanent injunction were truly a form of "removal", consistency would compel the judgment that § 30, which authorizes us to "remove" a judge, permits us to enter a permanent injunction, but, clearly, this is not the case.[14]

The language of § 4 neither permits nor forbids us to issue a permanent injunction against the holding of judicial office. The lack of superintending power to remove does not itself unavoidably entail a similar lack of superintending power to permanently enjoin. Removal deprives the judge of a more significant and tangible interest—his existing judgeship—than the interest impinged upon by a permanent injunction—the *potentiality* of attaining a judgeship—which is more problematic and uncertain.[15]

Nonetheless, a permanent injunction might implicate the right of the voters of Michigan to choose those who would hold judicial office. As our Brother LEVIN correctly observes, the recommended injunction would "prevent the electorate from ever again effectively exercising the franchise in favor of a particular person".[16] That suffrage is bestowed by our constitution. Const 1963, art 2, § 1; art 6, §§ 2, 8, 12, 16. Section 4 should be construed, if possible, to harmonize with other constitutional provisions.[17] We agree, therefore,

[14] See fn 11, *supra*.

[15] "[The] opportunity to be re-elected * * * is much too intangible an interest to invoke the protection of due process." *Gruenburg v Kavanagh,* 413 F Supp 1132, 1136-1137 (ED Mich, 1976), quoted in *In the Matter of Del Rio,* 400 Mich 665, 685; 256 NW2d 727 (1977).

[16] Justice LEVIN's opinion, p 259.

[17] "Of primary importance are two basic rules of constitutional construction.

"1. Every statement in a state constitution must be interpreted in the light of the whole document.

"2. Because fundamental constitutional principles are of equal

that § 4 does not comprehend the power to permanently enjoin a person from holding judicial office.[18]

## III

Charles V. Probert no longer holds judicial office. The commission recommends that he "be [(1)] removed from judicial office and [(2)] permanently enjoined from holding such office in the future".

The first recommendation is moot.

The second recommendation cannot be carried out for the reasons discussed in Part II.

Nonetheless, the possibilities of censure and conditional suspension remain,[19] and, therefore, our decision to deny the commission's recommendation does not foreclose the question of discipline.

The commission divided its findings into four general categories:

"(1) Respondent habitually and willfully disregarded statutes, court rules, canons and other ethical responsibilities in the administration of justice;

"(2) Respondent improperly used his judicial office to benefit his friends and court employees;

dignity, none must be so construed as to nullify or substantially impair another." *People v Blachura,* 390 Mich 326, 333; 212 NW2d 182 (1973).

[18] This is consistent with the fact that neither of our coordinate branches of government is constitutionally authorized to permanently enjoin a person from holding judicial office. Even in the case of the most extreme civil sanction that can be inflicted upon a judge—impeachment—the penalty "shall not extend further than removal from office". Const 1963, art 11, § 7.

[19] Aside from deciding that our power of superintending control, Const 1963, art 6, § 4, does not enable us to issue a permanent injunction against holding judicial office, we reserve the question whether and to what extent we could properly exercise the power in this case.

"(3) Respondent engaged in conduct giving rise to impropriety and the appearance of impropriety; and

"(4) Respondent exhibited a gross lack of judicial temperament and impartiality."

The commission elaborated its findings as follows:

"(1) As to the first general category, we adopt, as fully supported by the record, the findings that respondent wrongfully: thwarted the right of criminal defendants to appointed counsel; denied defendants the right to reasonable bail and perverted the bail process to unsuitable and improper purposes; denied defendants the right to an appeal bond; routinely denied the clear statutory right of misdemeanants to post a ten percent bond; and habitually abused his contempt power. Respondent's extrajudicial confiscation of weapons, however well motivated, constituted an act of judicial lawlessness. Under the same general category, respondent's refusal to obey an order of a superior court was an act of insubordination and conduct clearly prejudicial to the administration of justice. See *In the Matter of Bennett,* 403 Mich 178; 267 NW2d 914 (1978).

"Concerning the allegation in paragraph 12, the proofs showed respondent's unlawful acceptance in the *Jacobs* case of a guilty plea to a felony written on an appearance ticket. This is an action without any jurisdiction or justification and is a serious disregard of proper procedure. It pales by comparison to respondent's subsequent alteration of court and police records, his perjury in the court records, and his falsification of judicial records, all in an effort to cover up his misconduct.

"We find that the foregoing misconduct evaluated in its totality constitutes conduct clearly prejudicial to the administration of justice, misconduct in office, and persistent failure to perform judicial duties as proscribed by Const 1963, art 6, § 30, and GCR 1963, 932.4.

"(2) With regard to the second general category, we make the following observations: respondent improperly used his judicial office to benefit his friends and court employees. He abused the processes of the court, including his contempt power, to obtain a material benefit for

the nephew of his court constable. In a similar manner, he procured an employment test for his friend, and assisted her in preparing answers in advance of the test. * * *

"We find that this constitutes misconduct in office and conduct clearly prejudicial to the administration of justice within the purview of Const 1963, art 6, § 30, and GCR 1963, 932.4.

"(3) As to the third general category, conduct giving rise to impropriety and the appearance of impropriety, we find respondent's public intoxication and associated misconduct to be a grave breach of his responsibilities. * * *

"Respondent's drunkenness as proven did not involve his activities on the bench. However, his notorious, flagrant, and boorish behavior in the bars around Wyoming, Michigan, created a public spectacle, and doubtless scandalized the community. Thereby, he violated his duty to behave, 'in a sense * * * as though he is always on the bench'. *Bennett, supra.*

"We find that his behavior failed to avoid impropriety and its appearance and was conduct clearly prejudicial to the administration of justice within the meaning of Const 1963, art 6, § 30, and GCR 1963, 932.4. We find further that respondent's conduct aforesaid was such as to bring his office into disrepute.

"(4) As to respondent's gross lack of judicial temperament and impartiality, there are two general areas of misconduct. The first is respondent's injudicious behavior during arraignments and sentencings. The concrete examples of misconduct are legion and are fully and adequately discussed in the report of the master. Frequently, respondent interjected extraneous matters into the proceeding and made it appear that his determination in the case rested on them. He bullied and badgered defendants. In a number of cases as proven, the judge brandished his peculiar conceptualization of the relationship between the court and the police, referring to 'my police officers'. Particularly shocking conduct appears in *People v Joseph Bouwhuis,* and its companion cases. There, he told the defendants that there were 'pimps, murderers and homosexuals out at the Kent

County Jail' and the defendants would be 'some fresh meat for them'. Respondent's frequent statements at arraignments, as in that particular case, that the defendants 'don't need an attorney, but need a miracle worker instead' necessarily suggested that respondent had prejudged their case.

"In *People v Gary Schultz,* respondent referred to the defendant as a 'little bastard' from the bench. In *People v Charles Sharpe,* respondent's demeaning, sarcastic remarks about the defendant's admitted homosexuality made it obvious that Judge Probert sentenced him not for what he did, but for what he was.

"Another aspect of respondent's partiality and unjudicial temperament manifested itself during the preliminary examinations or trials in *People v Gary Bolot, People v Scott Selkirk, People v Thomas McKellar, People v Alan Metzger,* and *People v Nicholas Busser.* In the most crude and overbearing way, respondent interfered with the normal course of these proceedings and sought to obtain the desired result without the formality of a trial. Under these circumstances, respondent, like Judge Del Rio, himself improperly coerced guilty pleas. *Del Rio,* 702.

"We find this to be misconduct in office and conduct clearly prejudicial to the administration of justice, in contravention of the provisions of Const 1963, art 6, § 30, and GCR 1963, 932.4."

A review of the record reveals that the findings of the commission are amply supported. Further, respondent has filed no objection to the master's report upon which they are based. We therefore adopt the findings of fact and conclusions of law in the quoted portions of the commission's opinion.

To sum up, we find, as did the commission, that respondent's actions, taken as a whole, constitute conduct clearly prejudicial to the administration of justice, misconduct in office, and persistent failure to perform judicial duties, all proscribed by Const 1963, art 6, § 30, and GCR 1963, 932.4.

Certainly, this egregious misconduct and judicial perfidy warrant the imposition of disciplinary measures. This Court cannot ignore respondent's acts, not only because they violate the laws of this state, but also because, as stated in *Del Rio:*

"[T]he *real* issue in this case [is] the preservation of the integrity of the judicial system.

"The functions and decisions of a judge have an incalculable impact on the community at large. A citizen's experience with the law is often confined to contact with the courts. Therefore, it is important not only that the integrity of the judiciary be preserved but that the appearance of that integrity be maintained." *Del Rio,* 725.

The foregoing analysis applies with equal force to respondent.

Accordingly, in light of the nature and extent of his misconduct as documented by the commission, and pursuant to GCR 1963, 932.25, we hereby censure Charles V. Probert and impose a five-year conditional suspension without pay effective the date of this decision. Should he regain judicial office during that time, Mr. Probert will nevertheless be debarred from exercising the power and prerogatives of the office until at least the expiration of the suspension. Pursuant to GCR 1963, 866, the clerk of the Court is ordered to issue final process immediately upon release of this opinion.

COLEMAN, C.J., and WILLIAMS, FITZGERALD, and BLAIR MOODY, JR., JJ., concurred with RYAN, J.

LEVIN, J. *(dissenting).* The Judicial Tenure Commission has recommended that Charles V. Probert, who no longer holds judicial office, "be removed from judicial office and permanently enjoined from holding such office in the future".

We agree with the majority that a person cannot be permanently enjoined from holding judicial office.

The majority "conditionally suspends" Probert for five years from this date and censures him. We dissent because the commission is not empowered to recommend the discipline of, nor is this Court empowered, on the commission's recommendation, to discipline a person who no longer holds judicial office.

I

On April 17, 1978, the Judicial Tenure Commission filed a formal complaint against Charles V. Probert who was then municipal judge for the City of Wyoming. A supplemental complaint was filed May 24. A master was appointed to hear the charges and public hearings were held intermittently from July 11 to September 21.

The Wyoming Municipal Court was abolished by statute effective January 1, 1979 and replaced by a two-judge district court. Probert was defeated in his efforts at election to one of the new positions in November, 1978. His office expired December 31, 1978, and he has held no judicial office since that time.

The master's report was filed on January 3, 1979. The master found misconduct in office.[1]

---

[1] Probert refused to appoint counsel for indigent defendants; set excessive bail in order to coerce defendants to provide the court with information; insisted on cash bonds on appeal notwithstanding that a statute provides for surety bond; denied traffic offense and misdemeanor defendants their statutory right to post ten percent bond; freely fined and imprisoned persons for indirect contempt without formal notice of contempt charges, opportunity to employ counsel or hearing upon the charges; forced defendants to turn rifles and guns in to the court, in one case as a condition for setting bond; refused to obey an order of the circuit court to conduct a preliminary examination; accepted a plea of guilty of a felony, which was beyond his

Probert filed no objection to the master's report. On January 18, he filed in this Court a motion to dismiss for lack of jurisdiction and mootness. We denied the motion to dismiss "without prejudice to his raising the question of mootness in a petition to reject or modify the commission's recommendation under GCR 1963, 932.24(a)".

Probert was informed by letter that since he had filed no objections to the master's report, the Judicial Tenure Commission would consider the report without hearing and oral argument.[2] On April 9, 1979, a five-member majority of the commission adopted the master's findings of fact and conclusions of law and recommended that Probert be "removed from judicial office and permanently enjoined from holding such office in the future".[3]

Three members of the commission recommended that the complaint be dismissed because the commission's jurisdiction is limited to recommendations concerning persons holding judicial office when the recommendation is made.

The record was transmitted to this Court in

jurisdiction, and later falsified court records to show that the defendant was arraigned on a lesser charge; ordered a defendant before him on a contempt charge to vacate his home within 48 hours and deliver possession to the niece and nephew of a court employee who had purchased the house notwithstanding that no action for possession was pending before him; provided a friend with copies of a written examination and a typing test so that she would be able to pass the tests when actually administered and be eligible to become his deputy clerk; became intoxicated in public and called attention to himself by staggering about, speaking loudly about his judicial authority, soliciting sexual activity from a female stranger and openly engaging in sexual activity with another woman; argued with, badgered, and belittled defendants and suggested to them that the police would independently impose sanctions forbidden by law; attempted to induce guilty pleas by coercion; involved himself with witnesses concerning matters not before the court; and readily assumed the prosecutorial role in dealing with criminal defendants.

[2] GCR 1963, 932.16.

[3] The commission consists of nine persons. Eight persons participated in the decision in this case.

accordance with GCR 1963, 932.23, and Probert filed a petition to reject the commission's recommendation.

## II

The 1963 Constitution carried forward prior constitutional provisions granting this Court broad powers of superintending control.[4] However, the power to remove a judge from office was expressly denied;[5] a judge could be removed only by action of the Governor and the Legislature or by impeachment.[6]

The judicial article (art 6) of the 1963 Constitution was amended in 1968 by ratification of § 30, which establishes the Judicial Tenure Commission, sets forth the qualifications and method of selection of its members, and provides:

"On recommendation of the judicial tenure commission, the supreme court may censure, suspend with or without salary, retire or remove a judge for conviction of a felony, physical or mental disability which prevents the performance of judicial duties, misconduct in office, persistent failure to perform his duties, habitual intemperance or conduct that is clearly prejudicial to the administration of justice. The supreme court shall make rules implementing this section and providing for confidentiality and privilege of proceedings."

This Court promulgated GCR 1963, 932 implementing § 30.

---

[4] Const 1963, art 6, § 4.

[5] *Id.*

[6] "For reasonable cause, which is not sufficient ground for impeachment, the governor shall remove any judge on a concurrent resolution of two-thirds of the members elected to and serving in each house of the legislature. The cause for removal shall be stated at length in the resolution." Const 1963, art 6, § 25.

Impeachment is provided for in art 11, § 7.

A

The function of the Judicial Tenure Commission is to monitor the conduct of persons charged with the administration of justice and to recommend disciplinary action to this Court.

The focus of § 30 is on the discipline of persons with judicial tenure; indeed, the commission is denominated the Judicial Tenure Commission. This suggests that § 30 is concerned with the discipline of persons who have judicial tenure—persons who currently hold judicial office.

Further, the four types of disciplinary action listed in § 30—censure, suspension, retirement or removal—are stated to be actions in discipline of "a judge". A person who has left judicial office, by resignation, retirement or failure to gain re-election, is no longer a judge. Accordingly, by reason of the specific language of § 30, disciplinary action cannot be exerted against a person who has left judicial office; only judges are subject to discipline under § 30.

This reading of § 30 is also supported by an analysis of the types of disciplinary action authorized. Suspension, retirement and removal all involve the separation of a person from whatever judicial authority or office he has.[7] One may characterize an order which bars a person who is no longer a judge from holding judicial office in the future as a "suspension" (or, for that matter, as a "retirement" or "removal"), but such a characterization is a strained meaning of those words. The

[7] Removal is the means by which judges guilty of serious misconduct are divested of office. Retirement is intended for judges who, although guilty of no misconduct, are nevertheless unable to perform judicial duties. Suspension is not a divestiture of office; it is merely a separation of the judge from his judicial powers and duties. It is appropriate where misconduct or disability is serious but the situation is not thought to require that the judge be removed.

normal meaning of "suspension", which we are bound to accept,[8] is an act which has the present effect of separating *a judge* from the judicial authority or office he holds. The "conditional suspension" imposed by the majority would become effective only if the former judge again attains judicial office during the period of "conditional suspension" and is totally ineffective unless he does so—it has no present effect.

A person who has held but no longer holds judicial office may, indeed, be censured if "censure" is given its generic meaning as an utterance of strong disapproval, which can be directed to anyone, ex-judge or not, rather than its more specific meaning under § 30 as a level of discipline which, by identifying misconduct, seeks to cause a judge to correct his behavior in the future. "Censure" should not be read as intended to have a generic meaning when only the more specific meaning—discipline intended to correct the behavior of an incumbent judge—is consistent with the normal meaning of the other three types of discipline and with the accompanying modifying language that any discipline, including censure, be of "a judge". The meaning of a word may be known from the words accompanying it.[9] It is to be construed in context, not in the abstract.[10]

Censure was intended to be the least severe form of discipline, reserved for situations where, while some disciplinary action is indicated, the judge is expected to correct his conduct with a

---

[8] See, *e.g., Production Credit Associations of Lansing v Dep't of Treasury,* 404 Mich 301, 312; 273 NW2d 10 (1978).

[9] *State ex rel Wayne Prosecuting Attorney v Levenburg,* 406 Mich 455, 466-467, fn 8; 280 NW2d 810 (1979); Black's Law Dictionary (4th ed), p 1209.

[10] See, *e.g., Dussia v Monroe County Employees Retirement System,* 386 Mich 244, 248; 191 NW2d 307 (1971).

minimum of reprobation. Censure is appropriate where, while the judge has engaged in some misconduct, he is nonetheless fit to continue serving as a judge, and therefore retirement, suspension or removal is not appropriate.

It skews the constitutionally prescribed scheme of discipline to construe "censure" as a discipline which may be imposed on a person determined to be unfit to continue serving as a judge. Nor is it consonant with that scheme of discipline to censure a person who, since he no longer holds judicial office, cannot be expected to correct his conduct.

## B

We do not agree with the Court that it is within the intent of § 30 for this Court to both censure and impose some other form of discipline at the same time for the same misconduct.

Section 30 provides that this Court may, on recommendation of the Judicial Tenure Commission, "censure, suspend with or without salary, retire or remove a judge". The disciplines are listed in the alternative, and their gradation in severity indicates that it was contemplated that a choice of discipline would be made according to the severity of the misconduct.[11] The majority's decision to impose both censure and "conditional suspension" is thus at odds with the apparent intent of § 30.

## III

The commission argues that these proceedings should continue because

---

[11] See fn 7, *supra.*

i) Probert was a judge when the complaint was filed and the commission therefore had jurisdiction over the matter; once jurisdiction attaches it will not be defeated by subsequent events, even of a character which would have prevented it from attaching in the first instance. Thus, the commission and this Court have jurisdiction although Probert is no longer a judge.

ii) The proceedings still have a purpose because a) Probert can be censured and permanently removed from office, b) the Attorney Grievance Commission should have the benefit of this Court's determination, and c) a decision on the merits would provide guidance regarding proper conduct to the judiciary and the Judicial Tenure Commission.

## A

The commission accurately states the general rule regarding loss of jurisdiction. That rule of jurisdiction, however, does not govern this case.

When a person over whom jurisdiction has been properly obtained leaves the state, no question arises whether the court has power to continue to hear the case and enter a judgment binding on the person whose residency has changed because it is well established that a court has power to enter a judgment binding upon a non-resident over whom it has obtained personal jurisdiction. Since the court's power to enter final judgment is not limited to residents, its jurisdiction, once obtained, is not defeated by a party's change in status to a non-resident.

In this case, however, the issue is *whether* the power of the commission and this Court to act is defeated by a change in status from judge to ex-

judge. Thus it is the premise of the general rule regarding loss of jurisdiction—that the court's power to enter judgment is not affected by a party's change in status—which is in question here. The general rule cannot, of course, be cited as authority for its own premise.

Here, the power to recommend discipline and to enter a final order of discipline is defeated because § 30 authorizes the recommendation and imposition of discipline for incumbent judges only. Since the commission has no power to recommend discipline and the Court has no power to order discipline under § 30, neither the commission nor the Court has power to continue to address the merits of the disciplinary proceeding. It is the lack of power to recommend and to order discipline under § 30 which defeats jurisdiction under § 30.

## B

Since, as we all agree, this Court has no power to permanently enjoin Probert from holding judicial office (Part IV, *infra),* and there is no power to otherwise discipline him (Part II, *supra),* continuing proceedings would serve no purpose other than to punish or make an example of him, or inform the public of his misdeeds.[12] These are not independent functions of Judicial Tenure Commission proceedings, but merely consequences of the disciplinary function. Proceedings which should otherwise

---

[12] This case is thus distinguished from *In re Inquiry Concerning a Judge No 53, Linwood T Peoples,* 296 NC 109; 250 SE2d 890 (1978), upon which the commission relies, where a judge's removal for misconduct operated under North Carolina law as a disqualification from holding future office. Thus, embraced in the grant of the power to remove was the grant of the power and, implicitly, the obligation to determine whether the judge should ever hold judicial office in the future. This question remained after Peoples voluntarily left office.

terminate should not be continued simply to effect these ends.

1

The commission urges us to address the merits because "[a] finding in this proceeding that respondent's conduct was conduct prejudicial to the administration of justice would be highly persuasive in the proceedings before the Attorney Grievance Commission under the doctrine of stare decisis".

While the Attorney Grievance Commission has power to investigate and recommend discipline for conduct which has been the subject of Judicial Tenure Commission proceedings and the record of Judicial Tenure Commission proceedings is admissible at the hearing,[13] the Attorney Grievance Commission must find the facts itself and recommend the discipline it thinks appropriate. This is so even where the basis of discipline is the same kind of misconduct. The two commissions operate independently to protect distinct interests and maintain distinct professional standards.

A judge's conduct might be prejudicial to the administration of justice while identical conduct by a lawyer might not be. A person's conduct or temperament might render him unfit to hold judicial office while not substantially affecting his fitness to be a member of the bar.

If Probert is to be found guilty of conduct prejudicial to the administration of justice and that finding is to be the basis of attorney disciplinary action, the finding should be made in the context of attorney disciplinary proceedings so that the focus can be his conduct as a member of the bar and not his fitness for judicial office.

---

[13] GCR 1963, 965.

2

The commission argues that a disposition on the merits of this case will provide guidance for other judges and the commission itself.

To be sure, when a judge is publicly disciplined for specified misconduct other judges are informed what conduct may result in discipline and they may be deterred from that conduct. But the commission cannot properly conduct proceedings for this purpose alone when it otherwise lacks the power to proceed. A prosecutor cannot continue proceedings against, for example, a person who becomes incompetent or dies during the pendency of the proceedings on the rationale that although the court cannot convict him, other persons will learn what conduct will be the basis of criminal charges and will be deterred from that conduct.

3

The commission stresses that Probert has not disavowed an intent to seek judicial office in the future and that the only reason he is not now a judge is that his old office was abolished and he was not elected to a new position. Proceedings should continue, it is argued, because he might be elected or, as a former elected judge, be assigned to judicial office in the future.

A holding that this Court does not have authority under § 30 to discipline Probert at this time would not, however, absolve him of responsibility for judicial misconduct.

A judge is subject to discipline for conduct prior to his taking office or during a previous tenure.[14] Were Probert to regain judicial office after Judicial

14 GCR 1963, 932.4(d).

Tenure Commission proceedings terminated without imposition of discipline, he would again be subject to commission proceedings and, if appropriate, discipline might be recommended based in part on the record made in those proceedings.[15]

There remains the possibility that a resigned or defeated judge will be assigned judicial duties by this Court pursuant to its power under art 6, § 23 to authorize former elected judges to perform judicial duties for limited periods.

Continuation of Judicial Tenure Commission proceedings is not necessary to guard against improper exercise of the § 23 power. Judges are

---

[15] We recognize that the Judicial Tenure Commission's ability to recommend discipline based on prior misconduct in office might be embarrassed if judges were able to shield themselves from inquiry by resigning and could wait until evidence of misdeeds has faded with time, and then regain and hold judicial office with impunity. There might therefore be situations where it would be appropriate for this Court to direct the Judicial Tenure Commission to proceed against an ex-judge to the point of preserving testimony, or for this Court to initiate proceedings to that end pursuant to this Court's superintending authority under art 6, § 4. See GCR 1963, 930, providing for the superintendence of the judiciary of Michigan.

We have dealt by court rule with the corollary problem in civil cases. GCR 1963, 303 provides that "[a] person who desires to perpetuate his own testimony or that of another" may, before commencing an action, petition for an order authorizing the taking of depositions. "If the court is satisfied that the perpetuation of testimony may prevent a failure or delay of justice, it shall make an order designating or describing the persons whose depositions may be taken and specifying the subject matter of the examination and whether the depositions shall be taken upon oral examination or written interrogatories."

We need not here decide what action the Judicial Tenure Commission may take in order to preserve testimony. In this case, the Judicial Tenure Commission has proceeded well past the point of preserving testimony. We have before us hearing transcripts, a master's report and findings, and the Judicial Tenure Commission's findings and recommendation. All that we could possibly authorize has been done.

Nor need we decide today what opportunity should be afforded the ex-judge to himself preserve testimony or to object to the commission's findings if proceedings have progressed to that point. The proceedings below were conducted pursuant to court rule with Probert's participation, and Probert has never objected to the master's findings. See GCR 1963, 932.16.

assigned in the exercise of this Court's discretion; they have no tenure and no right to discharge judicial functions except as authorized by this Court. Assignments should be made after individual review and only those ex-judges who have enhanced the judiciary in the past and who can be expected to do so in the future should be recalled to the bench. Communication with the Judicial Tenure Commission should be but one step in the assignment process. The court rule which provides for confidentiality of commission records before a complaint is filed also provides that the commission may release information about assigned judges to the State Court Administrator.[16]

4

It might be argued that the commission should be permitted to proceed against ex-judges to protect the public's interest in being informed. We are persuaded that continuing proceedings for this purpose would exceed the grant of authority in § 30 and distort the intended function of the Judicial Tenure Commission.

Judicial tenure proceedings are confidential until a complaint is filed and are public thereafter. When a complaint has been filed and hearings have been conducted, as in this case, the public will have access to all information made a part of the record by the commission. Terminating proceedings when a judge resigns or retires or his office expires will only mean that discipline is not imposed—the public will still have access to information concerning his conduct.

When a judge ceases to hold office at an earlier stage in commission proceedings, or before pro-

---

[16] GCR 1963, 932.22, subds (d) and (e).

ceedings commence, less information will be available to the public through the commission. Education of the public, like education of other judges, is, however, merely a consequence of the disciplinary function. Section 30, creating a commission responsible for recommending discipline for persons holding judicial office, does not suggest that the education of the public is an end in itself, to be pursued after the disciplinary function has ceased.

The Judicial Tenure Commission, created to recommend discipline for judges in order to maintain the quality of the judiciary, was not constituted as a watchdog agency to pursue judges for the purpose of publicizing misconduct. Its function is to recommend corrective discipline or necessary removal. When a judge ceases to hold judicial office, the potential threat to the judiciary, and perforce, to the public, is removed and the authority of the commission to conduct proceedings to remove that threat necessarily ends. Discipline not intended to rehabilitate the judge or protect the judicial office is mere punishment. Judicial Tenure Commission proceedings are intended to be remedial, not penal.

Moreover, the termination of commission proceedings does not mean that the public will be inadequately informed. Other institutions, notably the press, serve the public's interest in being informed and may be expected to do so regardless of whether official commission proceedings continue.

Indeed, the press often reports on alleged judicial misconduct before the commission files a formal complaint. Rightly or wrongly, the practical reality is that this publicity and the prospect of commission proceedings cause some judges to resign or retire and some judges seeking re-election

to be defeated. If it is thought that a judge's resignation or retirement from office or his failure to win re-election does not adequately serve other public interests, the press—the institution primarily responsible for protecting the public interest in information—can continue investigating and reporting.

The public's interest in judicial discipline is in assuring that justice is administered properly, in preserving the integrity of the courts and the judicial process, and in maintaining public confidence in the judiciary by assuring that judges conduct themselves in a manner befitting their judicial office. The ex-judge holds no such office, does not administer justice and is removed from the courts and the judicial process.

5

Nor does the termination of commission proceedings preclude the operation of attorney disciplinary rules. If the judge's misdeeds were such as to render him unfit to be a member of the bar, the Attorney Grievance Commission may recommend discipline. Additionally, the ex-judge is subject to the criminal law. And, in an appropriate case, this Court could, in the exercise of its supervisory power, initiate or continue an investigation of its own if it appeared that the public interest required such extraordinary action.[17]

It should also be remembered, as stated earlier, that a judge who has left office is not thereby absolved of misconduct occurring prior to his election or appointment to office. If a judge who ceases to hold office before disciplinary proceedings run

[17] See GCR 1963, 930, providing for the superintendence of the judiciary of Michigan.

their course regains judicial office, the Judicial Tenure Commission may reactivate a previous inquiry into the judge's conduct and may recommend discipline based on that conduct.

The attorney discipline rules provide that a lawyer against whom a complaint is filed may not resign from the bar without admitting guilt.[18] If he does not sign an affidavit to that effect, proceedings will continue until termination.

Such rules were adopted pursuant to this Court's plenary authority to regulate the legal profession. The Court does not, however, have such plenary authority to expand or alter the requirements or terms of § 30. Such a limitation on the power to resign is not contained in § 30.

6

If the commission has the power to *continue* proceedings against one who is no longer a judge, it is difficult to discern a reason why it might not *initiate* proceedings against one who is not a judge for misconduct in office which has only come to light since the judge has left office. The commission then would have the power to require any retired or defeated judge, without regard to whether a complaint had been filed before he left office, to defend against charges of misconduct notwithstanding that these ex-judges may never intend or have the opportunity to hold judicial office in the future.

If the power asserted by the Judicial Tenure Commission in the instant case is recognized, the commission might feel obliged, as it apparently did in this case, to implement what the members of the commission who dissented from the majority's

---

[18] GCR 1963, 964.13.

recommendation characterized as "a policy of pursuit into retirement".

If the power exists, the public clamor caused by the unearthing of misconduct may cause the commission to feel obliged to employ it, with the result that the commission would be acting not to protect the public but to appease it. As a result, the commission's resources would be diverted from its primary function of protecting judicial office from misconduct to investigating and publicizing alleged misdeeds of persons who no longer hold, and may never again hold, judicial office. The resources of the commission should be dedicated to the essential purpose of § 30: preventing the abuse of judicial power by those who exercise that power.

## IV

The commission has recommended that Probert be permanently enjoined from holding judicial office. It argues that the constitution empowers this Court to permanently remove judges from judicial office, and therefore commission proceedings should not be terminated merely because a judge ceases to hold office.

## A

The commission contends that this Court needs no express authorization to permanently disqualify a removed judge from judicial office when Const 1963, art 6, § 4, is read in conjunction with § 30.

Art 6, § 4 expresses this Court's power of superintending control:

"The supreme court shall have general superintending control over all courts; power to issue, hear and determine prerogative and remedial writs; and appel-

late jurisdiction as provided by rules of the supreme court. The supreme court shall not have the power to remove a judge."

The power of superintending control is separate and distinct from the disciplinary power set forth in § 30. This Court may act pursuant to § 30 only on recommendation of the Judicial Tenure Commission, and may impose no discipline not based on a commission finding of specified cause.[19] In contrast, the commission has no role with respect to this Court's supervisory powers under § 4. That power is exercised without commission recommendation, and the commission has no authority to recommend action. See Part IVB, *infra.*

Moreover, this Court has no authority under its power of superintending control to permanently enjoin a person from holding judicial office.

This Court has been empowered to exercise general superintending control over all courts since the adoption of the Constitution of 1850.[20] The limitation on this power by the express withholding of the power to remove judges was added in the 1963 Constitution. The debates of the constitutional convention preceding the adoption of that constitution show that there was considerable concern that the superintending power as it then existed gave this Court too much power.[21] An amendment was offered that would have withheld the power not only to remove but also to suspend.

Delegates speaking in opposition to the amendment emphasized the value of granting broad superintending authority to the Court, and that any limitation was unnecessary in light of the re-

[19] *In the Matter of Mikesell,* 396 Mich 517, 524-527; 243 NW2d 86 (1976).

[20] Const 1850, art 6, § 3.

[21] 1 Official Record, Constitutional Convention 1961, pp 1269-1287.

straint shown by the Court during the 112 years it had possessed the "unlimited" power: no judge had ever been removed. Additionally, the power to at least temporarily suspend a judge was seen as essential to the proper superintending of the courts.

As a compromise, the convention adopted an amendment withholding the power to remove, thereby in effect granting the power of temporary suspension. Considerable trust was thus placed in this Court's restraint: the delegates were willing to take the risk of such a broad grant of power primarily because of their trust in the restraint the Court had shown in exercising it.

A permanent injunction against holding judicial office is not only tantamount to a removal for the term of office but also operates as a permanent removal *in futuro.*[22] To construe what was granted in § 4—the power temporarily to suspend from the exercise of judicial office—as the equivalent of what was expressly withheld—the power to remove from the office itself—would be to betray that trust, and would violate the understanding on which it was granted. We would not allow another arm of government to so expand its power; more so should we not allow ourselves.[23]

---

[22] It is this additional effect of a permanent injunction beyond the effect of a removal that precludes finding, as the majority states consistency would compel (Opinion of the Court, p 232), that § 30's authorization of a removal authorizes a permanent injunction.

[23] Although the majority concludes that § 4 does not authorize a permanent injunction against holding judicial office because such an injunction might defeat the electorate's constitutional right of suffrage, the majority states that "[t]he lack of superintending power to remove [under § 4] does not itself unavoidably entail a similar lack of superintending power to permanently enjoin." (Opinion of the Court, p 232). This is so, it is argued, because removal deprives a person of a "more significant and tangible interest" than does a permanent injunction. The former deprives one of "his existing judgeship" and the latter deprives one only of "the *potentiality* of attaining a judgeship". This conclusion is supported by a redacted quotation from

Under § 30, this Court was granted the power, previously expressly reserved, to remove judges from office. Removal was made subject to the safeguards of a two-step process—recommendation by the Judicial Tenure Commission and action by this Court.

Several jurisdictions provide by constitution or statute that a judge who has been removed from

---

*Gruenburg v Kavanagh,* 413 F Supp 1132, 1136-1137 (ED Mich, 1976), quoted in *In the Matter of Del Rio,* 400 Mich 665, 685; 256 NW2d 727 (1977): " '[The] opportunity to be re-elected * * * is much too intangible an interest to invoke the protection of due process.' "

When the quotation from *Gruenburg* included in *Del Rio* is placed in context or when the excised language is replaced, it is apparent that the courts were speaking of the damage to a judge's *prospects* for re-election caused by a temporary suspension, not of the complete denial of the *right* to hold judicial office if re-elected, which would be the effect of a permanent injunction in the instant case. Had the courts in either *Gruenburg* or *Del Rio* been asked to consider the denial of the right to hold a judicial office to which one has been elected or appointed, a deprivation similar to that of a convicted felon's right to hold certain elective offices, rather than the damage to one's prospects for re-election caused by the reputational damage of a suspension, it is doubtful that either court would have concluded that no interest entitled to due process protection was affected.

Moreover, to distinguish between the power to divest a sitting judge of his office and the power to enjoin a prospective judge from assuming any office he may gain through election or appointment is to ignore the effect of such an injunction.

If such an injunction has any effect at all, it is either as a removal (if the judge, despite the injunction, has become otherwise entitled to hold office through election or appointment) or as a threat of removal (if a prospective judge does not seek office because to do so would be futile in light of the injunction).

While it is clear from the terms of § 4 that this Court has no power to issue an injunction effective as a removal, the majority states that this lack of power does not necessarily preclude the issuance of an injunction effective as a threat of removal—assuming, apparently, that the threat will effectively keep a person from seeking office so that the injunction will never have the impermissible effect of actually removing an elected or appointed judge.

In other words, the majority suggests that the Court may threaten to do what it is constitutionally prohibited from doing. This is apparently based on the assumption that the threat will be effective. For only if the threat is effective in preventing the prospective judge from obtaining office will the force of the injunction be limited to removing the potential of attaining judicial office rather than removing the judge from an office he has attained.

office is thereafter disqualified from holding judicial office.[24] Michigan has no such provision.

---

[24] "A judge retired by the Supreme Court shall be considered to have retired voluntarily. A judge removed by the Supreme Court is ineligible for judicial office and pending further order of the court is suspended from practicing law in this State." Cal Const, art 6, § 18(d).

"Pending the determination of the proceedings, the Trial Division in its discretion may suspend the respondent from the exercise of his office. After full hearing, the Trial Division shall render such judgment as the facts may justify. No judgment shall extend further than: (1) to removal of the respondent from office, with or without disqualification to hold any public office of honor, trust, or profit under this State, or (2) to compulsory retirement from office; but such a proceeding, regardless of result, shall not bar or prejudice any other proceeding, civil or criminal, authorized by law." Okla Const, art 7-A, § 4(d).

"The justices of the Supreme Court and the judges of the superior court shall be subject to impeachment, and any judicial officer impeached shall not exercise his office until acquitted. The judges of the superior court shall also be subject to removal from office by the Supreme Court for such causes and in such manner as shall be provided by law." NJ Const, art 6, § 6, ¶ 4.

"If the Supreme Court finds beyond a reasonable doubt that there is cause for removal, it shall remove the judge from office. A judge so removed shall not thereafter hold judicial office." NJ Stat Ann 2A:1B-9.

"A judge or justice retired by the court of appeals shall be considered to have retired voluntarily. A judge or justice removed by the court of appeals shall be ineligible to hold other judicial office." NY Const, art 6, § 22(h).

"The jurisdiction of the court of appeals and the commission pursuant to this article shall continue notwithstanding that a judge resigns from office after a determination of the commission that the judge be removed from office has been transmitted to the chief judge of the court of appeals, or in any case in which the commission's determination that a judge should be removed from office shall be transmitted to the chief judge of the court of appeals within one hundred twenty days after receipt by the chief administrator of the courts of the resignation of such judge. Any determination by the court of appeals that a judge who has resigned should be removed from office shall render such judge ineligible to hold any other judicial office. The chief administrator of the courts shall give written notice to the commission of the resignation of any judge who is the subject of an investigation within five days after his receipt thereof." NY Judiciary Law, art 2A, § 47 (McKinney).

"Upon recommendation of the Commission, the Supreme Court may censure or remove any judge for willful misconduct in office, willful and persistent failure to perform his duties, habitual intemperance, conviction of a crime involving moral turpitude, or conduct prejudicial to the administration of justice that brings the judicial office into disrepute. Upon recommendation of the Commission, the Supreme Court may remove any judge for mental or physical incapacity

In those jurisdictions, the electorate has expressed its judgment that one who has been removed from office should never again be invested with the public trust and has, in effect, given up its own power to·re-elect such a person after removal. The Michigan electorate has expressed no similar sentiment except with regard to the eligibility for legislative office of persons who have been convicted of subversion or a felony.[25] Indeed it has expressed a contrary sentiment in regard to persons removed by impeachment.[26]

We are asked to hold that in adopting § 30 the electorate intended not only to grant the power to remove their elected judges from office in order to protect their interest in the proper administration

interfering with the performance of his duties, which is, or is likely to become, permanent. A judge removed for mental or physical incapacity is entitled to retirement compensation if he has accumulated the years of creditable service required for incapacity or disability retirement under any provision of State law, but he shall not sit as an emergency justice or judge. A judge removed for other than mental or physical incapacity receives no retirement compensation, and is disqualified from holding further judicial office." NC Gen Stat § 7A-376.

"A judge or district justice convicted of misbehavior in office by a court, disbarred as a member of the bar of this Commonwealth or removed under Subchapter C (relating to discipline and removal by Judicial Inquiry and Review Board) shall forfeit automatically his judicial office and thereafter be ineligible for judicial office." Pa Cons Stat Ann, tit 42, § 3305.

"The Supreme Court shall review the record of the proceedings on the law and facts and in its discretion may, for good cause shown, permit the introduction of additional evidence and shall order public censure, retirement or removal, as it finds just and proper, or wholly reject the recommendation. Upon an order for involuntary retirement for disability or an order for removal, the office in question shall become vacant. The Supreme Court, in an order for involuntary retirement for disability or an order for removal, may prohibit such person from holding judicial office in the future. The rights of an incumbent so retired to retirement benefits shall be the same as if his retirement had been voluntary." Tex Const, art 5, § 1-a(9).

[25] Const 1963, art 4, § 7.

[26] "No person shall be convicted without the concurrence of two-thirds of the senators elected and serving. Judgment in case of conviction shall not extend further than removal from office, but the person convicted shall be liable to punishment according to law." Const 1963, art 11, § 7.

of justice, but also to give up their power to re-elect judges to office after they have been removed.

The power to prevent the electorate from ever again effectively exercising the franchise in favor of a particular person is a much greater power than the granted power to remove or to suspend a judge. This greater power has not been expressly granted in this state, and should not be inferred. The grant should be unambiguous as in other jurisdictions.

We thus conclude that this Court has no authority under § 4 or § 30 to permanently enjoin Probert from holding judicial office.

B

In light of the commission's reliance upon this Court's § 4 power as authority for imposing discipline pursuant to § 30 proceedings, it is necessary to clarify that the powers granted this Court under § 4 are distinct from those granted under § 30. It would be improper for the commission or this Court to view § 4 as expanding the power to investigate and discipline pursuant to § 30 beyond the powers actually granted the commission and this Court by § 30.

This case comes to the Court pursuant to § 30. The commission initiated its investigation pursuant to its authority under that section. The commission's proceedings were or should have been limited by the disciplines it is empowered to recommend under § 30, not whatever action this Court could properly take under § 4. The power to recommend and impose discipline under § 30 differs from this Court's power to act under § 4. For example, pursuant to § 30 the Court may remove a judge, although it may not do so under § 4.

The Court should not blur the distinction between its superintending authority under § 4 and its authority to act in conjunction with the Judicial Tenure Commission under § 30 by using the commission to discharge this Court's duties under § 4, or by empowering the commission to investigate and recommend how this Court should exercise the discretion entrusted to it under § 4.[27]

C

The majority concludes that it has the power to "conditionally suspend" because on three previous occasions it has done so. The majority relies on *Mikesell*,[28] *Del Rio*,[29] and *Bennett*,[30] in which incumbent judges were suspended for one and one-half years, five years and one year respectively "regardless of respondent's possible intervening reelection to office or election to any other state court".

The majority states that the "effect of those suspensions *would have been* to disengage the disciplined party from judicial power, *but only had that person come to occupy judicial office again* during the term of the suspension". (Emphasis supplied.) This statement omits the pivotal distinction between the cited cases and the instant case.

In each of the cited cases, there was nothing "conditional" about the suspension at the time it was ordered. Each suspension operated to separate

---

[27] Turning a § 30 proceeding into a § 4 proceeding would effectively supplant the carefully drafted procedure for investigating and considering misconduct in office which this Court, in exercise of its § 4 powers, has provided in GCR 1963, 930 separate and apart from GCR 1963, 932 implementing § 30.

[28] *In the Matter of Mikesell, supra.*

[29] *In the Matter of Del Rio,* 400 Mich 665; 256 NW2d 727 (1977).

[30] *In the Matter of Bennett,* 403 Mich 178; 267 NW2d 914 (1978).

an incumbent judge from the authority of the judicial office he then held. In each case, the Court was required to act with regard to a sitting judge whose misconduct required that he be separated from the authority of his office. The Court ordered suspension.

The majority in the instant case ignores that the suspensions ordered in the cited cases were all of sitting judges, and focuses on the period of suspension ordered, *i.e.,* that the judges were suspended for periods longer than their terms of office. The only alternative to such an order, however, given that the Court had determined that it was necessary to separate the judge from his office and that the proper period of suspension was in excess of the judge's term, would have been to suspend the judge for the duration of his term without prejudice to reinstituting proceedings should the judge be re-elected or appointed. Perhaps such bifurcated and duplicative proceedings would have more closely conformed to the limitations of § 30. In any event, there is no indication that the Court considered that possibility or, indeed, that the Court considered the question for which the majority cites the cases as authority: whether § 30 authorizes imposition of a suspension which has *no* immediate effect.

Having determined that it was necessary to separate the judges in *Mikesell, Del Rio* and *Bennett* from the judicial powers or offices they then held, the Court was faced with the question of the appropriate period of suspension. The threshold question in the instant case, in contrast, is not how much discipline is appropriate but whether there is power to discipline at all. How the Court in *Mikesell, Del Rio* and *Bennett* resolved the question of how much discipline to impose is not

authority on the question whether this Court has the power to discipline in the first instance.

## D

The majority's treatment of the *Mikesell-Del Rio-Bennett* cases is critical because it is the only aspect of its argument which approximates authoritative support for its conclusion that, although § 30 provides only for discipline "of a judge", it also authorizes discipline of a person who is not a judge when disciplined. The other arguments of the majority are in the nature of what § 30 *should* authorize, as a matter of policy and wisdom, rather than what § 30 as adopted by the people *does* authorize, as a matter of construction of the language used and of the intent of the amendment.

Thus the majority asserts that to end commission proceedings when a judge leaves office would be "unwise" because a judge "should not have the power" to end commission proceedings "simply by leaving office". Such policy arguments are properly addressed to the framers of § 30. They cannot properly be the sole basis for a construction of § 30 which is opposed to the normal meaning of its language unless the Court can say without doubt that the normal meaning is so absurd or unreasonable as to preclude its having been intended.

We do not think it absurd, unreasonable or even "unwise" to terminate commission proceedings when, as stated by the majority, "the essential purpose of the commission—keeping unfit judges off the bench" has been achieved by the judge's "simply * * * leaving office".[31]

In this regard, we note that the American Bar

---

[31] Majority opinion, fn 10, and p 226.

Association appears to have adopted just such an "unwise" position in its Standards Relating to Judicial Discipline and Disability Retirement.[32] Standard 3.1, titled "Jurisdiction Over Sitting Judge", provides that the *judicial* disciplinary commission should have exclusive jurisdiction over the conduct of sitting judges.[33] Standard 3.2, titled "Jurisdiction Over Former Judge", provides that the *lawyer* disciplinary agency should have jurisdiction over a lawyer who is no longer a judge for conduct during his judicial tenure, unless the judicial discipline proceeding has resulted in a final determination.[34]

The situation presented by the instant case— that of a judge who ceases to hold office before a final determination has been reached in the judicial discipline proceedings—appears to be addressed by the commentary to Standard 3.2:

"Action by the commission or the court resulting in voluntary resignation or retirement should not be a bar to further action by the lawyer disciplinary agency involving the same conduct. This is true unless, on the court's own motion or application of the judge, and after notice and opportunity to be heard is given to the

[32] ABA Standards Relating to Judicial Discipline and Disability Retirement (Tentative Draft, 1977, approved by ABA House of Delegates, February, 1978).

[33] Standard 3.1 provides:

"*Jurisdiction Over Sitting Judge.* Other than jurisdiction through impeachment, the commission should have exclusive jurisdiction over the conduct of all sitting judges, including part-time judges. This jurisdiction should include conduct that occurred prior to a judge assuming judicial office."

[34] Standard 3.2 provides:

"*Jurisdiction Over Former Judge.* The lawyer disciplinary agency should have jurisdiction over a lawyer who is no longer a judge with reference to allegedly unethical conduct that occurred during or prior to the time when the lawyer held judicial office, provided such conduct has not been the subject of judicial disciplinary proceedings as to which a final determination has been made by the court."

lawyer disciplinary agency, the court orders that the lawyer disciplinary agency not proceed further."

Thus, under the ABA Standards, the judicial disciplinary commission is concerned with judges and the lawyer disciplinary agency with lawyers, including lawyers who were judges at the time of the alleged misconduct, even if judicial discipline proceedings had been commenced. Although the majority labels such a division of authority "unwise" and "unwarranted", it impresses us as simple and appropriate and, what is more important, seems to be precisely the division of authority intended by § 30, as appears from both the language of the section, which speaks of discipline "of a judge", and from an understanding of, in the majority's words, "the essential purpose of the commission—keeping unfit judges off the bench".

As indicated in the one reference to the ABA Standards made by the majority, the purpose of judicial discipline is not to punish but, rather, to correct:

"[T]he major purpose of judicial discipline is not to punish judges, but to protect the public, preserve the integrity of the judicial process, maintain public confidence in the judiciary, and create a greater awareness of proper judicial behavior on the part of judges themselves." ABA Standards, *supra,* p 2.

The public is protected and the integrity of the judicial process is preserved by preventing the abuse of judicial authority. Public confidence in the judiciary and "institutional integrity" are maintained by fostering the belief and expectation that those appearing before the courts will be treated with fairness and that the judges before whom they appear will not abuse their office. That

belief and expectation is fostered by preventive action against persons who are in a position to abuse judicial power. Disciplining a defeated judge neither protects the public or the "institution" (the justice system) nor does it foster that belief and expectation. Action against one who has no judicial power to abuse does not promote the public's confidence that those who do have judicial power will not abuse it.

The "discipline" ordered by the majority is punishment, not discipline. Its primary purpose is not to prevent the abuse of judicial authority but to react to abuse that has occurred. While we may agree that what the majority denominates the "egregious misconduct and judicial perfidy" of Probert warrants punishment, § 30 authorizes only discipline. We cannot agree that the suspension from judicial office of one who is not a judge and censure which cannot correct judicial conduct is, in any proper sense, judicial discipline. The procedure of § 30 should not be employed to provide a means to proclaim displeasure, however, justified, with judicial misconduct.

The Judicial Tenure Commission dissenters in this case said:

"Historically, both during the pendency of formal complaints and immediately preceding their issuance, the commission has declined to act further after termination of a respondent's judicial office by resignation, by failure to be re-elected or by death. *E.g., Matter of Grimm,* Formal Complaint No. 22; *Matter of Kapcia,* Formal Complaint No. 17; *Matter of Gruenburg,* Formal Complaint No. 14; *Matter of Riebel,* Formal Complaint No. 13; *Matter of Maras,* Formal Complaint No. 3. In fact, the final commission resolution in *Riebel, supra,* unanimously dismissed the proceedings because the commission 'lost jurisdiction' by virtue of the respondent's resignation.

* * *

"Consistency and good reason both require that this policy continue. The public interest and the interest in maintaining the good name of the judiciary are not served by further public airings of allegations and proofs of judicial misconduct. Continuation of this proceeding is in the true sense of the phrase 'beating a dead horse.' Clearly, once the judgeship is terminated the fundamental jurisdictional element ceases to exist."

## V

Charles Probert is no longer a judge and therefore there is no present need to discipline him. The chances of Probert ever again becoming a judge in Michigan appear to be virtually nil. We have, however, a full record replete with the details of his conduct. Should he ever regain office, this record will be available for evaluation by the Judicial Tenure Commission along with evidence pertaining to his interim conduct.

We would grant Probert's motion to dismiss without prejudice to the Judicial Tenure Commission's authority to recommend discipline based in part on the instant record should Probert ever regain judicial office.

KAVANAGH, J., concurred with LEVIN, J.